UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

BOBBY LEE TAYLOR,

                    Petitioner,

                              CASE NO. 2:16-CV-13400
v.                            HON. GEORGE CARAM STEEH
                              UNITED STATES DISTRICT JUDGE
THOMAS MACKIE,

                    Respondent.
_____/

## OPINION AND ORDER DENYING THE PETITION FOR WRIT OF HABEAS CORPUS AND DECLINING TO ISSUE A CERTIFICATE OF APPEALABILITY OR LEAVE TO APPEAL IN FORMA PAUPERIS

Bobby Lee Taylor, ("petitioner"), confined at the Carson City

Correctional Facility in Carson City, Michigan, seeks the issuance of a writ

of habeas corpus pursuant to 28 U.S.C. § 2254.  In his *pro se* application,

petitioner challenges his conviction for first-degree felony murder and first-

degree criminal sexual conduct.  For the reasons stated below, the petition

for writ of habeas corpus is DENIED.

### I.  Background

Petitioner was convicted following a jury trial in the Oakland County

Circuit Court.  This Court recites verbatim the relevant facts relied upon by

the Michigan Court of Appeals, which are presumed correct on habeas

review pursuant to 28 U.S.C. § 2254(e)(1). *See Wagner v. Smith,* 581 F.3d

410, 413 (6th Cir. 2009):

> Defendant was convicted of sexually assaulting and murdering Rosaline Lee, whose body was discovered floating in a lake in Pontiac on May 26, 2013. The victim was naked except for a sports bra pulled up over her breasts. An autopsy revealed that the victim died of manual strangulation. Abrasions on her arms, trauma to her forehead, and other injuries were indicative of a struggle. The victim's vaginal swabs revealed the presence of semen deposited within the last 24 hours, and DNA testing of it matched defendant's DNA profile.[1] The victim was involved in a relationship with Julius Hall,[2] a longtime friend, and the victim's family members and friends reported that the victim never mentioned defendant's name or engaged in one-night stands.
>
> The night before the victim's body was discovered, Jamar Carter, who had known Michelle Toth for two weeks and knew defendant "by face," invited Toth and defendant to his home. The three were observed on video cameras near a bus stop by St. Joseph's Hospital in Pontiac, and their bus ride was confirmed by the driver, Patricia Vuocolo, who exchanged phone numbers with defendant. Toth and defendant intended to engage in sexual relations in front of Carter, but Toth changed her mind and left to go to the hospital. After Toth and defendant left Carter's home, Carter discovered that three of his prescription bottles were missing. Carter's roommate, Andre Teasley, could not have been responsible for the missing bottles because he was hospitalized at the time. Telephone records and other evidence indicated that defendant had contacted multiple women that evening, but was

---

[1] According to the forensic science testimony, in comparing the DNA sample to the general population, one in 323.1 sextillion Caucasians would match the profile, one in 6.734 quintillion African–Americans would match the profile, and one in 751.9 sextillion Hispanics would match the profile. Furthermore, because a sperm tail was visible, intercourse had occurred within 24 hours. (Footnote original).

[2] Forensic examination of the DNA evidence excluded both Hall and Bernard Kimble—who will be discussed in more detail *infra*—as potential contributors. (Footnote original).

not successful in connecting up with any of them. Defendant admitted in a police interview that he was trying to "hook up" with a woman that evening.

The victim was last seen at the Chase office building in Pontiac, where she went to meet the father of her child, Matthew Caffey, to obtain money for diapers. The victim called Caffey at 3:17 a.m. on May 26 to advise him that she was in the parking lot, but when Caffey began to exit the building, he saw the victim's white van drive out of the lot. Caffey believed there was another individual in the van, but his efforts to contact the victim by phone call and text went unanswered. The office building was 1–1/2 to 2 miles from the hospital where defendant was observed that evening. At approximately 9:00 a.m., a man answered Caffey's call to the victim's phone and indicated that he had found the phone in pieces on the ground.

The day after the victim's body was recovered, her white van was found near an abandoned school and wooded area. Prescription bottles belonging to Carter and Teasley were found in or near the van. Police contact with Carter led them to seek out defendant, and Vuocolo assisted the police by texting defendant to request his photograph. When brought into custody on June 5, 2013, defendant gave conflicting accounts of his whereabouts and contacts that weekend, denied the theft of any prescription medications, and invoked his right to counsel. During his statement, he admitted to parole violations because of his use of marijuana and alcohol. A parole hearing was held the next day and defendant received a 30–day sentence. While serving the sentence, a warrant was authorized against defendant for the victim's homicide. When interviewed a second time on June 20, 2013, defendant denied knowing the victim, but declined to speak further after invoking his right to counsel.

The prosecution's theory at trial was that defendant was on a "mission" to have sex on the night of May 25–26 and, after Toth reneged on their plan to have sex in front of Carter, and defendant was unsuccessful in connecting with other women, he

encountered the victim at the Chase office building and seized upon that opportunity to carry out his mission, whereupon he apprehended, sexually assaulted, and then killed her. The defense denied that defendant was the perpetrator, and argued that the prosecution's witnesses were not credible, that there were other plausible suspects, and that the DNA evidence was the product of contamination.

*People v. Taylor*, No. 320085, 2015 WL 5657380, at *1–2 (Mich. Ct. App. Sept. 24, 2015).

Petitioner's conviction was affirmed on appeal. *Id., lv. den.* 499 Mich.

871, 875 N.W.2d 227 (2016).

Petitioner seeks a writ of habeas corpus on the following grounds:

I. [Taylor's] convictions failed the sufficiency of the evidence test and should be set aside and vacated. US Const Am XIV.

II. The prosecution violated MRE 403 by referencing the "penis image." The trial court erred in denying a mistrial. US Const.

III. [Taylor] was denied a fair trial when the circuit court excluded the statement of an unavailable third party that he was the person who murdered Ms. Lee. VI and XIV Amendments.

IV. [Taylor] unequivocally request[ed] counsel. His Fifth and Fourteenth Amendment rights were violated when the police failed [to] scrupulously honor that request. The trial court erred in failing to suppress the entirety of his statement.

V. [Taylor's] illegal arrest, detention without probable cause determination violated his Fourth Amendment constitutional right.

VI. [Taylor] was denied his constitutional right to the effective assistance of counsel as guaranteed by the US Const Am XIV.

VII. [Taylor's] federal due process right was violated when police held him in custody illegally and refused to release him back into his normal life environment to constitute a break in custody. His Fourteenth Amendment right was violated when police used an illegal statement to gain tactical advantage as a device to violate his parole conditions without a warrant or probable cause determination.

## II. Standard of Review

28 U.S.C. § 2254(d), as amended by The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), imposes the following standard of review for habeas cases:

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–

(1)resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

A decision of a state court is "contrary to" clearly established federal law if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or if the state court decides a case differently than the Supreme Court has on a set of materially

indistinguishable facts. *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000). An "unreasonable application" occurs when "a state court decision unreasonably applies the law of [the Supreme Court] to the facts of a prisoner's case." *Id.* at 409. A federal habeas court may not "issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id.* at 410-11. "[A] state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011)(citing *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). Therefore, in order to obtain habeas relief in federal court, a state prisoner is required to show that the state court's rejection of his claim "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington,* 562 U.S. at 103. A habeas petitioner should be denied relief as long as it is within the "realm of possibility" that fairminded jurists could find the state court decision to be reasonable. *See Woods v. Etherton,* 136 S. Ct. 1149, 1152 (2016).

## III. Discussion

### A. Claim # 1.  The sufficiency of evidence claim.

Petitioner argues there was insufficient evidence to establish his identity as the person who raped and murdered the victim.

It is beyond question that "the Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In Re Winship,* 397 U.S. 358, 364 (1970).  But the critical inquiry on review of the sufficiency of the evidence to support a criminal conviction is, "whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 318 (1979).  This inquiry, however, does not require a court to "ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt." Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Id.* at 318-19(internal citation and footnote omitted)(emphasis in the original).

More importantly, a federal habeas court may not overturn a state court decision that rejects a sufficiency of the evidence claim simply

because the federal court disagrees with the state court's resolution of that claim. Instead, a federal court may grant habeas relief only if the state court decision was an objectively unreasonable application of the *Jackson* standard. *See Cavazos v. Smith,* 565 U.S. 1, 2 (2011). "Because rational people can sometimes disagree, the inevitable consequence of this settled law is that judges will sometimes encounter convictions that they believe to be mistaken, but that they must nonetheless uphold." *Id.* Indeed, for a federal habeas court reviewing a state court conviction, "the only question under *Jackson* is whether that finding was so insupportable as to fall below the threshold of bare rationality." *Coleman v. Johnson*, 132 S. Ct. 2060, 2065 (2012).

Finally, on habeas review, a federal court does not reweigh the evidence or redetermine the credibility of the witnesses whose demeanor was observed at trial. *Marshall v. Lonberger*, 459 U.S. 422, 434 (1983). It is the province of the factfinder to weigh the probative value of the evidence and resolve any conflicts in testimony. *Neal v. Morris*, 972 F. 2d 675, 679 (6th Cir. 1992). A habeas court therefore must defer to the fact finder for its assessment of the credibility of witnesses. *Matthews v. Abramajtys*, 319 F. 3d 780, 788 (6th Cir. 2003).

The Michigan Court of Appeals rejected petitioner's claim:

The evidence revealed that on the night the victim was killed, defendant went to Carter's home with Toth to engage in sexual relations in front of Carter. However, Toth declined to participate, left Carter's residence, and checked into a hospital. Defendant left his phone number with Carter and indicated that he frequently had relations with women, and they would "hook" up another time. Later that evening, after defendant's departure, Carter realized that three of his prescription medicine bottles were missing. Carter's roommate at the time, Teasley, was hospitalized, and therefore, could not have committed the theft, and Carter did not have any other guests at his home.

The victim agreed to meet Caffey later that night at his office building to obtain money for diapers. The office building was 1–1/2 to 2 miles from St. Joseph's hospital, where defendant was last seen. The victim called Caffey at 3:17 a.m. to indicate that she had arrived at his building. When Caffey came downstairs, he saw the victim's van driving away from the building, and Caffey believed that someone else was in the van with the victim.

The victim was dating Hall, and her family and friends indicated that she did not engage in a promiscuous lifestyle and had never mentioned defendant's name. The victim's body was found the next morning in Terry Lake, and her bra was raised over her breasts. The evidence indicated that she struggled with her assailant, causing blunt force trauma to her forehead, abrasions to her arms, bruising to her elbow, and died from manual strangulation. Testing revealed that DNA matching defendant's DNA profile was found in the victim's vagina. The victim's van was found the next day near an abandoned school, and prescription bottles belonging to Carter and his roommate were found near the vehicle. Defendant gave a statement to the police in which he acknowledged having relationships with various women and trying to "hook up" with a woman that evening.

The circumstantial evidence permitted the jury to infer that

defendant took Carter's and Teasley's prescription medication when he was at Carter's home. Defendant's phone records indicated that he contacted multiple women that evening, but did not successfully connect up with any of them. However, the evidence revealed that defendant made contact with the victim within 24 hours of her death because his DNA was left in her vagina. Additionally, she had incurred multiple injuries, which she did not have before she left her home to meet with Caffey. The circumstantial, physical, and DNA evidence was sufficient to enable the jury to find beyond a reasonable doubt that defendant stole pills from Carter's home, encountered the victim at Caffey's office building and drove away with her in her van, and then sexually assaulted her before strangling her to death and placing her body in Terry Lake. The jury could find that defendant left the scene in the victim's van, which he left near an abandoned school, and that the presence of Carter's prescription medication in the vicinity of the van, which defendant had stolen earlier that night, further linked him to the victim's apprehension, sexual assault, and murder.

Defendant identifies various itemized points that he contends refute his identity as the perpetrator. However, the facts on which defendant relies to cast doubt on his guilt were submitted to the jury. Defendant essentially argues that the jury should have interpreted the evidence differently. Defendant's argument ignores that the weight and credibility of evidence, and the inferences to be drawn from the evidence, are matters for the jury to resolve. This Court must defer to the jury's determination of those matters, and we may not substitute our judgment for the jury's verdict. Moreover, the prosecution was not required to negate every theory consistent with defendant's innocence, but only had to prove its own theory beyond a reasonable doubt regardless of contradictory evidence offered by defendant. The evidence was sufficient to enable the jury to find beyond a reasonable doubt that defendant was the perpetrator of the charged crimes.

*People v. Taylor*, 2015 WL 5657380, at * 2–3 (internal citations omitted).

Under Michigan law, "[T]he identity of a defendant as the perpetrator of the crimes charged is an element of the offense and must be proved beyond a reasonable doubt." *Byrd v. Tessmer*, 82 F. App'x. 147, 150 (6th Cir. 2003)(citing *People v. Turrell*, 25 Mich.App. 646, 181 N.W.2d 655, 656 (1970)).

In the present case, there was strong circumstantial evidence which established petitioner's identity the perpetrator. Circumstantial evidence alone is sufficient to support a conviction, and it is not necessary for the evidence at trial to exclude every reasonable hypothesis except that of guilt. *Johnson v. Coyle,* 200 F. 3d 987, 992 (6th Cir. 2000)(internal quotations omitted). Identity of a defendant can be inferred through circumstantial evidence. *See Dell v. Straub,* 194 F. Supp. 2d 629, 648 (E.D. Mich. 2002).

Eyewitness identification is not necessary to sustain a conviction. *See United States v. Brown,* 408 F. 3d 1049, 1051 (8th Cir. 2005); *Dell v. Straub,* 194 F. Supp. 2d at 648. The victim's vaginal swabs revealed the presence of semen deposited within the last 24 hours. The DNA testing of this semen matched petitioner's DNA profile. The DNA evidence was sufficient in and of itself to establish petitioner's identity as the perpetrator.

*See e.g. U.S. v. Seawood,* 172 F. 3d 986, 988 (7th Cir. 1999); *Kelley v. Jackson,* 353 F. Supp. 2d 887, 892 (E.D. Mich. 2005).

Additional circumstantial evidence supported a rational trier of fact concluding that petitioner raped and murdered the victim. Jamar Carter, Michelle Toth, and petitioner were observed on video cameras near a bus stop by St. Joseph's Hospital in Pontiac, on the night in question, which was only one and a half to two miles from where the victim was last seen alive. Carter testified that Toth and petitioner went to his house intending to have sex. Carter testified that shortly after petitioner left his house, he discovered that three of his prescription medications were missing. These medications were found the next day inside of or near the victim's van. The victim was last seen driving this van at about 3:17 a.m. on May 26 by Matthew Caffey in the parking lot where he worked. Caffey believed there was another individual in the van. A jury could infer from this evidence that petitioner stole the prescriptions from Carter's house, met up with the victim in the early morning hours, drove with her in her van, before sexually assaulting and murdering her.

All of this circumstantial evidence was sufficient for a rational trier of fact to conclude beyond a reasonable doubt that petitioner sexually

assaulted and murdered the victim. *See Spalla v. Foltz,* 788 F. 2d 400, 402-03 (6th Cir. 1986)(conviction of second-degree murder was supported by sufficient circumstantial evidence, including witnesses' description of getaway car, other witnesses' testimony placing defendant in car with same general description and location of cornfield only 15 minutes from victim's house, where defendant and victim had left together).   Moreover, "Pieces of evidence are not to be viewed in a vacuum; rather, they are viewed in relation to the other evidence in the case." *Davis v. Lafler*, 658 F.3d 525, 533 (6th Cir. 2011).  Because there were multiple pieces of evidence to establish petitioner's identity as the perpetrator, the Michigan Court of Appeals did not unreasonably apply *Jackson v. Virginia* in rejecting the petitioner's sufficiency of evidence claim. *See Moreland v. Bradshaw,* 699 F. 3d 908, 919-21 (6th Cir. 2012).

### B.  Claim # 2.  The evidentiary law claim.

Petitioner next contends that he was denied a fair trial by the admission of irrelevant and prejudicial evidence that petitioner sent a text photograph of his penis to Ms. Vuocolo on the night of the rape and murder.

It is "not the province of a federal habeas court to reexamine state-

court determinations on state-court questions." *Estelle v. McGuire*, 502
U.S. 62, 67-68 (1991). A federal court is limited in federal habeas review to
deciding whether a state court conviction violates the Constitution, laws, or
treaties of the United States. *Id.* Errors in the application of state law,
especially rulings regarding the admissibility of evidence, are usually not
questioned by a federal habeas court. *Seymour v. Walker,* 224 F. 3d 542,
552 (6th Cir. 2000). Petitioner's claim that he was denied a fair trial by the
admission of irrelevant and highly prejudicial evidence cannot form the
basis for habeas relief, because it involves a state law evidentiary issue.
*See Hall v. Vasbinder*, 551 F. Supp. 2d 652, 676 (E.D. Mich. 2008); *rev'd
on other grds* 563 F.3d 222 (6th Cir. 2009); *See also Oliphant v. Koehler*,
451 F. Supp. 1305, 1308 (W.D. Mich. 1978). Petitioner is not entitled to
relief on his second claim.

### C. Claim # 3. The exclusion of evidence claim.

Petitioner next argues that he was denied his right to present a
defense because the trial judge refused to allow him to call Robert Combs
to testify that a man named Bernard Kimble admitted to killing the victim.

The Michigan Court of Appeals rejected petitioner's claim:

Defendant did not establish that there were particularized
guarantees of trustworthiness to demonstrate the reliability of

-14-

Kimble's alleged confession. Combs testified that he had limited contact with Kimble on four occasions, and that Kimble was always intoxicated, angry, and irate. Combs stated that Kimble was intoxicated and slurring his words when he began to give details about putting a "young girl" in a "river," at which point Combs cut him off. This testimony did not present corroborating circumstances or circumstantial guarantees of trustworthiness. Kimble made the alleged statement while in an intoxicated state, and his limited statement did not reveal actual knowledge or details of what transpired, only what would have been reported in the community in news reports. Moreover, Kimble's unavailability was not adequately explained. Defense counsel asserted that Kimble was unavailable because he would not appear to incriminate himself, but counsel also acknowledged that, as a matter of trial strategy, he did not intend to call Kimble to testify. Rather, counsel stated that he had reviewed Kimble's statement, knew Kimble had passed a polygraph, and knew that if he called Kimble to testify and he denied committing the murder, Combs could be called for impeachment evidence. However, defense counsel stated that he did not intend to employ the strategy of impeachment evidence. Considering the totality of the circumstances, the trial court did not abuse its discretion in determining that Kimble's alleged confession to Combs lacked circumstantial guarantees of trustworthiness to be admissible. [3]

*People v. Taylor*, 2015 WL 5657380, at * 8.

Just as an accused has the right to confront the prosecution's witnesses for the purpose of challenging their testimony, he also has the right to present his own witnesses to establish a defense. This right is a fundamental element of the due process of law. *Washington v. Texas*, 388

---

[3] And, in regard to defendant's argument that the statement was admissible under MRE 804(b)(3), defendant failed to show that Kimble was unavailable to testify, creating another barrier to admissibility under that rule. (Footnote original.)

U.S. 14, 19 (1967); *See also Crane v. Kentucky,* 476 U.S. 683, 690 (1986).

However, an accused in a criminal case does not have an unfettered right

to offer evidence that is incompetent, privileged, or otherwise inadmissible

under the standard rules of evidence. *Montana v. Egelhoff*, 518 U.S. 37, 42

(1996). The Supreme Court, in fact, has indicated its "traditional reluctance

to impose constitutional constraints on ordinary evidentiary rulings by state

trial courts." *Crane,* 476 U.S. at 689. The Supreme Court gives trial court

judges "wide latitude" to exclude evidence that is repetitive, marginally

relevant, or that poses a risk of harassment, prejudice, or confusion of the

issues. *Id.* (*quoting Delaware v. Van Arsdall,* 475 U.S. 673, 679 (1986)).

Moreover, under the standard of review for habeas cases as

enunciated in § 2254(d)(1), it is not enough for a habeas petitioner to show

that the state trial court's decision to exclude potentially helpful evidence to

the defense was erroneous or incorrect. Instead, a habeas petitioner must

show that the state trial court's decision to exclude the evidence was "an

objectively unreasonable application of clearly established Supreme Court

precedent." *See Rockwell v. Yukins,* 341 F. 3d 507, 511-12 (6th Cir. 2003).

In *Chambers v. Mississippi*, 410 U.S. 284, 300 (1973), the Supreme

Court ruled that the state trial court's exclusion of a third party's confession

to the crime that the defendant was charged with on hearsay grounds

violated due process where the circumstances revealed the confessions to

be reliable.  The Supreme Court found that the confessions were made

under circumstances which provided "considerable assurance of their

reliability" where:

> 1.  each statement was made spontaneously to a close
> associate shortly after the murder was committed;
> 2. each statement was corroborated by some other evidence in
> the case, whether it was the declarant's sworn confession,
> eyewitness testimony, or evidence linking the declarant to the
> murder weapon;
> 3. each statement was against the declarant's interests; and
> 4. the declarant was available to be cross-examined about the
> out-of-court statements.

*Chambers*, 410 U.S. at 300-01.

When a statement against interest of a witness unavailable to testify

at trial is offered to exculpate an accused in a criminal case, there are three

requirements under F.R.E. 804(b)(3) for its admission:

> 1.  the declarant must be unavailable to testify;
> 2. the statement must subject the declarant to real criminal
> liability; and
> 3. corroborating circumstances clearly indicate the
> trustworthiness of the statement.

*United States v. Price,* 134 F. 3d 340, 347 (6th Cir. 1998).

M.R.E. 804(b)(3) imposes the same requirements as F.R.E. 804(b)(3)

for the admission of such statements.

A trial court does not need to be completely convinced that the exculpatory statements are true as a prerequisite to their admission; the trial court need only find that sufficient corroborating circumstances exist which indicate the statement's trustworthiness. *Price*, 134 F. 3d at 348. However, although the requirement of corroboration is "not unrealistically severe", it does go "beyond minimal corroboration." *United States v. Mackey*, 117 F. 3d 24, 29 (1st Cir. 1997). Moreover, statements that are of dubious exculpatory value and bear considerable indicia of unreliability can be excluded from evidence. *Turpin v. Kassulke*, 26 F. 3d 1392, 1397 (6th Cir. 1994).

Petitioner has failed to show that the state trial court's decision to exclude Mr. Combs' proposed testimony was unreasonable. There was no corroborating evidence of any kind in this case, as required by *Chambers. See Sinkfield v. Brigano,* 487 F. 3d 1013, 1018 (6th Cir. 2007). Petitioner failed to show the that the trial court's determination that the trustworthiness required for the admission of a hearsay statement against penal interest was absent regarding Kimble's purported confession was an unreasonable application of clearly established federal law. Petitioner is

therefore not entitled to habeas relief on his third claim. *See Allen v. Hawley,* 74 F. App'x. 457, 462-63 (6th Cir. 2003).

### D.  Claim # 5.  The Fourth Amendment claim.

Petitioner next contends that his Fourth Amendment rights were violated because the police lacked probable cause to arrest him and because he was not timely arraigned.

A federal habeas review of a petitioner's arrest or search by state police is barred where the state has provided a full and fair opportunity to litigate an illegal arrest or a search and seizure claim. *Stone v. Powell*, 428 U.S. 465, 494-95 (1976); *Machacek v. Hofbauer*, 213 F.3d 947, 952 (6th Cir. 2000).  For such an opportunity to have existed, the state must have provided, in the abstract, a mechanism by which the petitioner could raise the claim, and presentation of the claim must not have been frustrated by a failure of that mechanism. *Riley v. Gray*, 674 F.2d 522, 526 (6th Cir. 1982). The relevant inquiry is whether a habeas petitioner had an opportunity to litigate his claims, not whether he in fact did so or even whether the Fourth Amendment claim was correctly decided. *See Wynne v. Renico,* 279 F. Supp. 2d 866, 892 (E.D. Mich. 2003); *rev'd on other grds* 606 F.3d 867 (6th Cir. 2010).  Indeed, under *Stone*, the correctness of a state court's

conclusions regarding a Fourth Amendment claim "is simply irrelevant."
*See Brown v. Berghuis,* 638 F. Supp, 2d 795, 812 (E.D. Mich. 2009).

The Court is aware that the petitioner's trial counsel did not file a
motion to suppress the evidence and thus there was no ruling from the trial
court with respect to the petitioner's Fourth Amendment claims. The
petitioner, did, however, raise his Fourth Amendment claims before both
the Michigan Court of Appeals and the Michigan Supreme Court on direct
appeal. Both courts analyzed and rejected his claims.

The failure to conduct a hearing in the trial court on the petitioner's
various Fourth Amendment claims does not mean that the petitioner did not
have a full and fair opportunity to litigate his Fourth Amendment claims.
*See Good v. Berghuis,* 729 F. 3d 636, 638-40 (6th Cir. 2013). The Sixth
Circuit in *Good* noted that "[t]he *Powell* 'opportunity for full and fair
consideration' means an available avenue for the prisoner to present his
claim to the state courts, not an inquiry into the adequacy of the procedure
actually used to resolve that particular claim." *Id.* at 639.

The opportunity to litigate, for purposes of *Stone v. Powell,*
encompasses more than an evidentiary hearing in the trial court. It also
includes corrective action available through the appellate process on direct

review of the conviction. *See Rashad v. Lafler,* 675 F. 3d 564, 570 (6th Cir. 2012); *Lovely v. Jackson*, 337 F. Supp. 2d 969, 976 (E.D. Mich. 2004). Because all of the material facts were before the state appellate courts on direct review and the appellate process was not otherwise deficient, petitioner had a full and fair opportunity to litigate his Fourth Amendment claims and is thus not entitled to relief.

### E.  Claims # 4, # 6, and # 7.  The suppression of statements/ineffective assistance of counsel claims.

Petitioner argues in his fourth and seventh claims that his statements to the police should have been suppressed because he invoked his right to counsel.  In his related sixth claim, petitioner alleges that trial counsel was ineffective in failing to challenge the admissibility of petitioner's second statement to the police.

An evidentiary hearing was conducted on petitioner's claim on October 30, 2013.  On November 26, 2013, the judge denied petitioner's motion to suppress his statements.

Petitioner was interviewed twice by the police, first on June 5, 2013, and again on June 20, 2013.

Petitioner was taken into custody on June 5, 2013 and interviewed by Detectives Marougi and Buchmann.  The interview was recorded and

transcribed. (See Exhibit 100, This Court's Dkt. 13-1).  Detective Marougi

read petitioner his *Miranda* rights early in the interview.  Petitioner indicated

that he understood those rights (Exhibit 100, pp. 6-7).

The following exchange then occurred:

Det. M: Ok. You want to talk to us?

Bobby: I mean about what? The situation that was brought to my
attention or

Det. M: We'll talk man, like that last one that I talked about it's like I can
ask you hey man, what's your name and you can tell me your name,
and then I can say hey man, what color is your shirt. I don't like that
question, let's go on to the next one. And he would be like what's his
name. Well let's not talk about that, you got another question?

Bobby: Mmhmm.

Det. M: We'll get to it all. So you can pick and choose what you want,
but we can't tell you anything or talk to you until.

Bobby: Oh, I know. Trust me, I know.

Det. M: Wanna talk to us?

Bobby: I mean, talk to you guys about what? I don't know exactly what
I'm here for other than the fact that was brought to my attention.

Det. B: We can't get into it until you agree to talk to us.

Det. M: And you can stop it any time you want.

Bobby: What questions are you looking for?
Det. M: That's what I'm saying, but we can't get there until we get over
this hurdle.

Bobby: I'm not understandin, you know what I mean. If you all come at me directly with a question then I will answer it. Flat out, I'm not going to bull shit you.

Det. B: That's fine but let me clarify this. Do you understand those rights that Joey read to you?

Bobby: Mmhmm. Yeah.

Det. B: Ok, do you want to talk to us about why all the three of us are sitting in this room.

Bobby: No, I, I don't even know what this pertains to so I how can i talk to you guys, you know if I knew what it was pertaining to I would.

Det. M: You can stop at any time.

Bobby: I would rather stop. Talk to a lawyer. I mean I'm tryin to be, I'm trying to be cordial, you know what I'm sayin. I'm not about bull shit.

Det. B: I don't care about cordial.

Bobby: I know, I know you don't but some people be disruptive and don't.

Det. M: So we can't get over that hurdle. We'll, we'll tell you exactly what we're here for.

Det. B: Yeah. We'll get into it but,

Bobby: I pretty much know what I'm here for now because you brought the situation up about you know, as far as you know, do I know what I'm here for, you know what I'm sayin?

Det. M: I don't.
Det. B: You're talkin in, you're talkin in double talk and you're talkin out both sides of your mouth dog. It's simple. Look at me, look at me. It's simple alright? You are 42 years old Right? You are a grown man,

right?

Bobby: Mmhmm

Det. B: You read and write.

Bobby: Yes.

Det. B: Ok, you understand the words that are coming out of my mouth, right?

Bobby: Yes.

Det. B: Ok, it's simple. Joey read you your rights. Just because you are here does not mean you don't have rights. You know that because you've been in the system. Ok? Right?

Bobby: Mmhmm

Det. B: Yeah, I need words, verbal words. Yes? You understand that?

Bobby: Yes.

Det. B: Ok. We want to talk to you about something. We can't get into it with you until you agree to talk to us. That's your right.

Bobby: I don't want to talk, I really don't want to talk because I may want to stop you know, somewhere.

Det. M: You can stop at any time.

Det. B: You can stop at any time.

Bobby: Well then let's go then.

Det. B: Ok sir, you agree to talk to us for now?

Det. M: We'll talk and if you decide you don't want to talk anymore, you can stop, and we ain't gonna get mad at you. Say Joey, Jeff, I'm done talking to you guys. And then you ain't got to answer nothing.

Bobby: So if I stop in the middle of a conversation, does that violate my rights?

Det. M: No.

Det. B: It doesn't violate your rights.

Det. M: That is your rights.

Bobby: Ok. Alright.

Det. B: That is your right.

Det. B: If it takes us 2 hours to get this hashed out, just so you understand your rights.

Bobby: Mmhmm

Det. B: We'll do that. Ok? I don't have any problem with that.

Bobby: I don't need no 2 hours, I'm

Det. M: It's like what we said earlier man. We'll talk about, we'll talk about what we want to talk about, tell you what we're here about. You know we'll get into some questions, If you want to answer them, you can answer them.

Bobby: Well then let's go. Let's go.

Det. B: Ok, so, but we gotta clarify some things.

Bobby: I agree to talk to you.

(*Id.*, pp. 7-9).

After speaking with the detectives for an extensive period of time, petitioner later asked for the interview to stop. (*Id.,* p. 50).

The Michigan Court of Appeals rejected petitioner's claim:

In the present case, defendant's statements during the early portion of the June 5 interview, viewed in context, indicate that defendant sought to determine why he was brought in for an interview. Defendant never made an unambiguous invocation of his right to silence. The detectives indicated that the purpose of the interview would be revealed during questioning if defendant agreed to waive his rights and speak to the detectives. Although defendant said he would "rather stop" and "[t]alk to a lawyer," he continued immediately thereafter, on his own accord, by stating that he was willing to be cordial to the detectives. Defendant continued conversing with the detectives, who explained that they wanted to talk to defendant and would tell him "what we're here for," but they could not do so unless defendant agreed, which was his right. Defendant indicated that he was reluctant to talk because he might want to stop the interview, but after the detectives assured defendant that he could stop the interview at any time, defendant agreed to waive his rights and answer questions. Because the record does not reflect a clear, unambiguous invocation of the right to counsel at the beginning of the June 5 interview, there was no plain error in refusing to suppress the portion of that interview before page 50, or in refusing to suppress the June 20 interview in its entirety.

*People v. Taylor*, No. 320085, 2015 WL 5657380, at * 9.

It is true that once an accused invokes his right to counsel during custodial interrogation, that interrogation must cease until counsel is made available, unless the accused initiates further conversation with the police. *Edwards v. Arizona*, 451 U.S. 477, 484-85 (1981). However, the "[i]nvocation of the *Miranda* right to counsel 'requires, at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney.'" *Davis v. United States*, 512 U.S.

452, 459 (1994)(quoting *McNeil v. Wisconsin*, 501 U.S. 171, 178 (1991)). The suspect's statement "must unambiguously request counsel." *Id.* at 459. Additionally, "[u]nless the suspect actually requests an attorney, questioning may continue." *Id.* at 462.

In the present case, the trial court judge and the Michigan Court of Appeals did not unreasonably apply clearly established federal law by finding that petitioner did not clearly and unequivocally invoke his right to counsel, because fairminded jurists could conclude that petitioner's passing reference to an attorney was not an unambiguous request to speak with counsel. Indeed, in *Davis,* the Supreme Court concluded that the defendant's statement "Maybe I should talk to a lawyer" was not an unequivocal request for counsel. *Davis,* 512 U.S. at 462.

Other cases have found similar language to be too equivocal to amount to an unambiguous request to speak to counsel, so as to require the police to cease their interrogation. *See U.S. v. Amawi,*695 F. 3d 457, 485 (6th Cir. 2012);(defendant's statements during *Miranda* warning, that "I'm going to wait" and asking "is there a lawyer on board" were neither clear nor unequivocal invocation of the right to remain silent or the right to counsel, as would warrant suppression of inculpatory statements made on

board jet from Jordan to United States from prosecution for conspiracy to kill and maim persons outside the United States)*; Rogers v. Kerns,* 485 F. App'x. 24, 31 (6th Cir. 2012)(habeas petitioner's inquiry after signing his *Miranda* waiver form and immediately before confessing "I can't write this with a lawyer or anybody[?]," was not an unequivocal invocation of the right to counsel); *Cornelison v. Motley,* 395 F. App'x. 268, 274 (6th Cir. 2010)(habeas petitioner's comment "What if I want my lawyer present first?" too ambiguous to require the police to terminate their interrogation, particularly where petitioner proceeded afterward to fill out waiver form and then indicated he wished to speak with the police); *Ledbetter v. Edwards,* 35 F. 3d 1062, 1070 (6th Cir. 1994)(defendant's statement during police interrogation, that "it would be nice" to have an attorney, was too ambiguously worded to require police to stop questioning defendant).

Moreover, once petitioner asked whether he could have an attorney present, the detectives ceased asking petitioner questions about the case and instead asked him questions in which they sought to clarify whether he was invoking his right to counsel. When a suspect makes an ambiguous or equivocal statement about counsel, "it will often be good police practice for the interviewing officers to clarify whether or not he actually wants an

attorney." *Davis,* 512 U.S. at 461. It was thus "entirely proper" for the detectives to continue questioning petitioner for the sole purpose of determining whether he wished to consult with an attorney. *Id.,* at 462. After being asked by the detectives whether he wished to speak with an attorney or continue speaking with them, petitioner indicated that he wanted to continue to speak with the police.

In light of the facts of this case and the cases mentioned above, petitioner is unable to show that the state courts' conclusion that petitioner did not clearly and unequivocally invoke his right to counsel "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington,* 562 U.S. at 103.

Moreover, petitioner is unable to show how he was prejudiced by the admission of his statement to the police, because petitioner never actually confessed to sexually assaulting or murdering the victim. Even if petitioner was interrogated in violation of *Edwards v. Arizona*, the admission of his statement to the police did not have a substantial and injurious influence or effect on his jury, in light of the far more incriminating evidence that was introduced against petitioner at his trial, including the DNA evidence. *See*

*Kyger v. Carlton,* 146 F. 3d 374, 382-83 (6th Cir. 1998).

In his related sixth claim, petitioner contends that trial counsel was ineffective for failing to move to suppress his entire June 5, 2013 police interview, on the ground that petitioner had invoked his right to counsel at pages 7 and 8 of the interview.

To prevail on his ineffective assistance of counsel claims, petitioner must show that the state court's conclusion regarding these claims was contrary to, or an unreasonable application of, *Strickland v. Washington*, 466 U.S. 668 (1984). *See Cathron v. Jones,* 190 F. Supp. 2d 990, 996 (E.D. Mich. 2002). *Strickland* established a two-prong test for claims of ineffective assistance of counsel: the petitioner must show (1) that counsel's performance was deficient, and (2) that the deficient performance prejudiced the defense. *Strickland,* 466 U.S. at 687.

As mentioned above, petitioner failed to establish that he unequivocally invoked his right to counsel at the beginning of the police interrogation on June 5, 2013. In light of the foregoing, there was no reasonable probability that a motion to suppress the statements taken by police during the earlier portion of the June 5, 2013 interview based on an alleged *Edwards* violation would have succeeded in this case. Petitioner

was therefore not denied effective assistance by his trial counsel's failure to move for the suppression of the earlier part of his June 5, 2013 statement on this basis. *See e.g. Koras v. Robinson,* 123 F. App'x. 207, 210-12 (6th Cir. 2005).

In his seventh claim, petitioner contends that it was improper for the police to reinitiate questioning of him on June 20, 2013, after he had invoked his right to counsel at the end of his June 5, 2013 interview.

The *Edwards* rule does not apply if there has been a break in custody of more than 14 days after the accused invokes his right to counsel. *See Maryland v. Shatzer,* 559 U.S. 98, 110-11 (2010). In the prison context, where an inmate has returned to the general prison population after invoking his or her right to counsel during a custodial interrogation, there has been a break in custody for purposes of the *Edwards* rule. *Id.,* 113-14. Petitioner invoked his right to counsel at the end of his police interview on June 5, 2013. The police spoke with petitioner again some fifteen days later on June 20, 2013, when petitioner was incarcerated on an unrelated parole violation. The police spoke to petitioner on June 20th, after there had been a break in custody with his initial police interrogation. Under the circumstances, the admission of petitioner's statements in his June 20,

2013 interview did not violate *Edwards.*

Moreover, as with his first statement on June 5, 2013, petitioner is unable to show how he was prejudiced by the admission of his statement to the police on June 20th, because petitioner did not confess to sexually assaulting or murdering the victim. Thus, the admission of petitioner's second statement to the police did not have a substantial and injurious influence or effect on his jury, in light of the incriminating evidence that was introduced against petitioner at his trial. *See Kyger,* 146 F. 3d at 382-83.

### IV. Conclusion

The Court will deny the petition for writ of habeas corpus. The Court will also deny a certificate of appealability to petitioner. In order to obtain a certificate of appealability, a prisoner must make a substantial showing of the denial of a constitutional right. 28 U.S.C. § 2253(c)(2). To demonstrate this denial, the applicant is required to show that reasonable jurists could debate whether, or agree that, the petition should have been resolved in a different manner, or that the issues presented were adequate to deserve encouragement to proceed further. *Slack v. McDaniel*, 529 U.S. 473, 483-84 (2000). When a district court rejects a habeas petitioner's constitutional claims on the merits, the petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims to be debatable or wrong. *Id.* at 484.

"The district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant."  Rules Governing § 2254 Cases, Rule 11(a), 28 U.S.C. foll. § 2254.

For the reasons stated in this opinion, the Court will deny petitioner a certificate of appealability because he has failed to make a substantial showing of the denial of a federal constitutional right. *Myers v. Straub,* 159 F. Supp. 2d 621, 629 (E.D. Mich. 2001).  The Court will also deny petitioner leave to appeal *in forma pauperis,* because the appeal would be frivolous. *Id.*

## V. ORDER

Based upon the foregoing, IT IS ORDERED that the Petition for a Writ of Habeas Corpus is **DISMISSED WITH PREJUDICE.**

IT IS FURTHER ORDERED That a Certificate of Appealability is **DENIED.**

IT IS FURTHER ORDERED that Petitioner will be **DENIED** leave to appeal *in forma pauperis.*

Dated:  June 20, 2017

s/George Caram Steeh
GEORGE CARAM STEEH
UNITED STATES DISTRICT JUDGE

CERTIFICATE OF SERVICE

Copies of this Order were served upon attorneys of record on June 20, 2017, by electronic and/or ordinary mail and also on Bobby L. Taylor #226121, Carson City Correctional Facility, 10274 Boyer Road, Carson City, MI 48811.

s/Barbara Radke
Deputy Clerk